Wst Solutions of LA, Inc. v. Lafayette City-Parish Consolidated Government Mr. Gianbrone, whenever you're ready. Good morning, and may it please this Honorable Court, Guyce Gianbrone on behalf of the Appellant Progressive Waste Solutions of Louisiana. Your Honors, there are three salient issues we are here to address today. The underlying facts of the case have been extensively briefed, extensively discovered through the last two and a half years that we have been arguing these issues. But that is not what we are here to discuss today as far as the underlying facts are concerned. We have three issues to be addressed before this Court. Number one, does Progressive Waste Solutions of Louisiana have the standing to bring the claim under its lease agreement with Waste Facilities of Lafayette? Number two, in the event that Progressive Waste does have the standing, is the action ripe as far as the takings claim is concerned? And then number three, in the event that this Court finds the takings claim to be unripe, which we of course dispute, is the substantive due process claim independent of the takings claim to where the Federal Court can maintain and should maintain jurisdiction over that portion of the claim itself? Those are the three issues that we want to address to this Court today. More so than the underlying facts of the actions taken by LCG, the Lafayette Consolidated Government. Beginning with the lease argument, Your Honors, the lower court, in what we believe to be dicta, however, must be addressed here today, the underlying court found that Progressive Waste did not have a standing as a lessee because they found that the lease agreement itself was a contract to lease as opposed to a contract of lease. Now that is an issue we vehemently dispute. The plain reading of the lease agreement itself, which is entered into the record, shows that it was entered into on June 7th of 2011 between Progressive Waste Solutions of Louisiana, at the time called IESI Corporation, and Waste Facilities of Lafayette. As this honorable court is certainly aware, for a lease to be valid, it must have a thing, a price, and consent of the parties. We have a thing, the property on Sunbeam Lane. We had a price as set forth in the lease agreement itself, and we had consent. Now the underlying court and LCG would argue, well, there was a condition to the lease that was not met, and therefore the lease was vitiated. Even if you're, you know, the actual property owner here, forget the lease. I mean, I see this as purely a regulatory takings case because the land can be used for an amusement park or a shopping mall or to build homes. I mean, no one's taking the physical land. So isn't the only basis for the taking here the denial of the permit as a regulatory taking, which, I mean, I think it is a taking, and that's why the city paid a bunch to the permit holder, but isn't that the issue? How does the land itself give rise to a takings claim? That is correct on the regulatory takings claim, Your Honor. You are reading that correctly. Now I'll go into the separate argument about the substitute process, which I do believe is separate and apart. But, yes, this is a regulatory takings claim, and we'll move into a— Why does it matter that the land wasn't—right, so if the land wasn't taken, why does the lease issue really even matter all that much? Well, it matters because it gives us standing as a lessee to step into the shoes of the lessor as an interested party with a vested interest. But only as to the permit denial because the permit— Well, as to the moratorium itself as well, which is a completely separate issue because you do have the permit revocation, and you also have the moratorium. What case law says a moratorium on one use out of potentially hundreds of a property? I mean there's cases out there that just says any development, a moratorium on any development can give rise to a taking claim. But here, like I said, this land can be used for anything basically but this waste facility as I understand it. And you're correct, and that goes to the arbitrary and capricious nature under the substitute process claim and the fact that my client is only in the waste business. We were leasing this property. We relied upon the lease agreement, the issuance of the permits for our stated purpose, which is the collection and disposal of non-hazardous waste. The argument that, well, you could use it for anything else, well, my client can't use it for anything else. That's what we could use it for. And so, again, I'm trying to separate out the regulatory takings versus substitute process because they are two separate issues. But the lease agreement is important because it is what gives my client the standing. We're not the permit holder. We admit that. We're not the landowner. We are a lessee, and a lessee has rights under Louisiana law to step into the shoes of the lessor as we have that vested property right or that vested right to the use of the property, which is what was taken from us in this case. So I'll tell you you're in a tough business. This is the second sitting in a row where I've had a waste treatment facility complaining about being excluded from doing their thing. But on the issue of using the state court as an initial remedy, the exhaustion, I'm having a hard time grasping why you think that would be a futile process. I mean, you cite all these state court cases, which you claim give you this right under state law. So why wouldn't the state courts follow those cases? Everything I read, you're complaining about the city of Lafayette, and they're not doing anything for us. But, I mean, they're not the state court judges. So what's your futility argument? Well, the futility argument, obviously we have a twofold argument under Williamson County. The first is that you exhaust all administrative remedies. Well, obviously the only remedy was going to the council, and the council unanimously passed this ordinance, which, by the way, the second step of an administrative remedy is a veto by the mayor. The mayor, in this case, chose not to sign it, which, by his testimony, was the first and only time he's ever done that in his tenure, although he gave a very detailed memorandum, which is in the record, as to why he thought this was the wrong decision to make by the council. So as far as an administrative remedy is concerned, the first prong of Williamson County, that, we believe, is satisfied. The judicial remedy. So we go to the second remedy, which is the judicial remedy. And quite frankly, Your Honor, I understand Williamson County is a 30-year-old case decided by the Supreme Court. It's been cited on numerous occasions. I certainly would not second-guess the United States Supreme Court. However, the Chief Justice did. Justice Rehnquist, in the San Remo Hotel decision, which was in 2005, 20 years after Williamson County, said, you know what? We may have made a mistake when it came to that second prong of the test. Because then what happens in the findings in Williamson County, what Williamson County does is it takes a federal takings claim away from any party. We cannot, my client cannot or any other party, cannot come to the federal court on a federal takings claim under Williamson County. They said, well, you have to go to the state court first. Well, you go to the state court first, as what happened in San Remo, and they said, well, you've already litigated this in state court. You can't come back to us in federal court. And that's where Justice Rehnquist said, you know, guys, this doesn't make a whole lot of sense. Because now you have a federal takings claim, which can never be litigated in federal court. It has to be litigated by the state court. And that's where we believe the primary basis lies for the argument on the takings claim is, yes, we had the futility argument. Because you take it to state court, there's an inverse, there is a procedural vehicle, the inverse condemnation claim. However, we do believe that would be a futile endeavor, particularly as a result of the state court's inability to enforce any type of judgment. The federal courts haven't been too good to you so far in this lawsuit. No, they haven't. I just don't see why you think state court is so much worse for you. Why is that so clear? State courts can't enforce the judgment, Your Honor, against the municipality, as we all know. And state courts are not really the proper forum to make a determination on a federal takings or a federal substitute due process claim. That would be this court. That would be the federal court. We do have an inverse condemnation suit that was filed, as is noted in the record. We filed it a couple of years after the initial suit in order to preserve our rights. And we do have that option. But, number one, we believe that the takings matter should be here before this court under San Marino. Well, under Justice Rehnquist's reasoning in San Marino. Of course, that was not the majority opinion. But secondarily, we divided out the takings and the substitute due process. Now, here is the real factor in this case. The moratorium and the revocation of the permit are two separate actions. All by the same ordinance, but two separate actions. Now, the courts have stated on more than one occasion, and I cite to John Corp and Bienville Quarters, as far as a substitute due process claim is not subsumed by the takings claim, when, as in Bienville Quarters, the defendants challenge the actions as not rationally related to a legitimate state interest, while the takings claim challenges the parish's taking without compensation. So, on our substitute due process claims, we're talking about the arbitrary and capricious nature of the action. And that is clear, and quite frankly, undisputed. When you look at the evidence that was taken in this case, from the deposition of the mayor, the deposition of the plaintiff's expert, the deposition of the council members, including Councilman Sheldon, the depositions of the members of the administrative body that did the planning and zoning, it is clear that this was an arbitrary and capricious action of the council, not legitimately related to a legitimate state interest. How is it arbitrary to do what just about every other town does, which says, sure, we generate tons of trash, but we want some other town to deal with storing it and getting rid of it? And ultimately, that does happen in a lot of cases. Because of health, environmental reasons, whatever else, even if mistakenly, that's the way citizens perceive it. But you can't just say it. You have to have a reason behind it. You can't just say health, safety, and welfare. I thought there was an outcry because some citizens realized this was going to be built, and they contacted their city council members and said, oh, my God, did you know what these terrible, even though their name is progressive, these terrible waste solution people are going to do? So what's the rational basis? And that's where we lie in this case, in that the discovery, the evidence produced in this case, particularly the deposition testimony and the testimony on the record by Councilman Shelvin, the author of the ordinance, who says, look, I don't need a reason to do it. No, I don't know what a waste transfer station does. I've never reviewed any articles that say that it's a detriment to the health, safety, and welfare. I can do what I want because I'm the councilman, and that's my prerogative. No, it's not. You still have to have a legitimate state interest. And just saying health, safety, and welfare doesn't make it so. So we have shown, and quite frankly, the city's attorney agreed. That memorandum is in the record. He said, you know, this is a bad idea. The mayor disagreed. He said this is a bad idea. But the council still passed it 9-0. And the arbitrary and capricious nature of that action is where we separate the substantive due process from the takings. Now, Bienville Quarters, as cited previously, is a prime example of a case such as that. John Corp, by this court, I believe a 2000 decision by the U.S. Fifth Circuit Court of Appeal. And in both of those cases, you have the courts noting, and Bienville Quarters I believe is a middle district case, but you have those cases noting that you do have a separation of the claims for purposes of rightness as to whether or not the substantive due process claim can remain in the federal court if, in fact, the takings claim is found to be unripe and has to go back to state court. I think the evidence is clear in this case. We talk about it, and again, I was hesitant to get into many of the facts of that particular issue, but I think it is very relevant to this court in that the plaintiff's expert, Steve Villavasa, we took his testimony. And even he admitted two of the publications that the city was relying upon to say waste transfer stations are bad for the health, safety, and welfare actually say, you know what, a waste transfer station is a good idea. It's good for the environment because it lessens road traffic and things of that nature with the trucks. He even said, Mr. Villavasa, who again is the plaintiff's expert, that every planning and zoning plan that he has put together includes zoning for a waste transfer station. These things are good for the community. Of course, nobody wants them in their backyard. We understand that. Where in your opening brief, I know you argued in your opening brief that the substantive due process and equal protection claims didn't sufficiently overlap with the takings and should be separated and looked at here. But where did you actually then argue the merits of those claims? Well, Your Honor, we were limited in scope as to what we could argue. If we agree with you that these are severable from the takings, you want us to just remand and say, even though the district court already did? I believe we have touched on the merits in our briefings, Your Honor, in our original and in our reply brief, to the extent that we could. We had three major issues we had to address here in a limited scope of time. But that being said, yes, at the very least it should be remanded. But I believe this court does have the evidence before it to make a ruling, to make a determination that the actions of the Lafayette Consolidated Government was arbitrary and capricious. And we've cited to Mr. Shelvin's testimony. We've cited to the statements he made in the public forum. We have cited to Mr. Villalvaso's report and some of the statements he has made. And it's clear that the actions taken were arbitrary and capricious. This is not just coming from our people. This is coming out of the mouths of their own witnesses. Now, Lafayette wants to say, well, yeah, but really you don't have any standing to sue. The action is really only waste facilities of Lafayette, and that's why we settle with them. You don't really have any standing. Well, we disagree. This is a facility that was being built to our specifications and our request for our operations, and we do believe that that does allow us separate grounds. Your Honor, I am running out of time. Thank you very much for your consideration. We have reserved five minutes for rebuttal. Thank you. Okay, thank you, sir. Mr. Laborde. Good morning. Cliff Laborde from Lafayette, representing the city of Lafayette. Your Honors, did not hear an explanation to Judge Costa's question about where's the futility. They argue futility, but they don't give any substance behind it. They don't tell you why the inverse condemnation proceeding under Louisiana law, which has been validated throughout the courts of Louisiana, would be a futile exercise. That's a big problem for them. They have a contract that they entered into with the landowner, and they call it a lease agreement, but it has several suspensive conditions in that contract, all of which have to be satisfied before there's an actual lease. They signed this lease agreement before they even owned a piece of land. They didn't even own a piece of land. The owner got a building permit three months later and began work on it, and I think, Judge, you sized it up correctly. They moved the trucks in. The residents in the neighborhood got suspicious, finally found out it was a garbage facility, and they contacted the councilman and said, please do something about this. Nobody wants a garbage facility with 60 or 70 trucks of garbage coming in, and you don't have to be an expert to know that garbage attracts rodents and flies and whatever else, and nobody wants to live next door to it, and they know that. That's why they were flying under the radar and getting WFL, the landowner, to buy, build, and then do a lease purchase with them later. The landowner got the building permit. Progressive Waste Facilities never got a permit, never had a valid lease agreement in place, because he talks about thing, price, and consent. The thing was the building. The thing was the land with this building that wasn't built yet, so there's a serious problem with his legal position on thing, price, and consent was all in place in June of 2011. I mean, that's ludicrous. I want to spend a little bit of time touching upon the Williamson County requirements, the two prongs there, which are not satisfied. This case was not ripe to be brought because they failed to exhaust state remedies under the Louisiana inverse condom. What about his argument, and I don't know if I saw it in the briefs, but he made it today that a state court judgment wouldn't be enforceable against your client. Would not be enforceable. I thought that's what he said. I thought because as a municipality, I mean, you'll have to remember what he says. We're not going to let him get back up here and explain, but I thought he was saying the state court judgment wouldn't be enforceable against the city. Maybe I misunderstood. I never heard of that. Cities get sued all the time, and they pay judgments. I'm sure they have to appropriate for them if they don't have insurance for it, but just like the state gets sued all the time, you have to go get a. . . He may be thinking of money judgment, I guess. Pardon, Your Honor? Could he be thinking of a money judgment not being enforceable? We can ask him when he gets back up. But Williamson County has an exception, which they try to qualify for, and that's a futility exception, but, again, there's no meat on that bone. He makes the argument, but he doesn't back it up with facts to prove that this would have been futility, and that's progressive burden of proof. Moreover, the inverse condemnation claim was brought by progressive in federal court under diversity jurisdiction. So that was sitting there before the district court in this suit. Now, futility? Why, when we file a motion for summary judgment for dismissal of the claims, does progressive run down to state court, the very place where, I guess he told you he can't get a judgment, and file suit against the city? It's pending right now. It's in abeyance until this appeal is done, but that's what they did. So if it's that futile, their actions belie the futility argument because they're chasing it down in Lafayette right now with a pending lawsuit. I think the court was astute in recognizing that the substantive due process claim and the equal protection claim, which were dismissed by the district judge, but addressed by the district judge, have no merit here. You don't just get up when you think you've been aggrieved by a local ordinance and start going around arbitrary and capricious, them fighting words. Council members have duties. I'm sure it's often like herding cats when you're sitting on a town council anywhere in the country. But they have a duty, or a lot of them feel they have a duty to protect the local citizens. And when a garbage dump is coming into the middle of the parish, we don't have a rural parish in Lafayette. Maybe back in the day it was, but it's not that way anymore. We're jammed for space. And they found this lot, there are residences across the street, there's a mobile home park on another side of it, and they say, well, you know, that's already in bad shape, so we can bring a garbage dump in. Those people won't be bothered. That's not the way it works. There's no case that says that. This court is bound to protect the interests of all citizens. And the way they went about doing it was improper. They don't have, I mean, standing, that was the first thing out of Mr. Jambroni's mouth today. I don't see that word in his brief, but he does have a problem because he was not the permittee, or progressive, his client, was not the permittee, they weren't a licensee, and if this court is going to open the door and go past the bright line rule, which has been established by this court, you have to be a licensee, a landowner, or a permittee. You've got to have some connection. They didn't have it yet. They had a deal to do a deal later, provided all these things happened. And some of them were in place, but the city stepped in right away and passed an ordinance, and the case law is plain. I guess it's the Supreme Court, but there have been rulings from this court that said, you know, with all due respect to this court, the Supreme Court doesn't want federal courts sitting as a super legislative authority to pass upon the wisdom of local ordinances that the city council has every right to pass. I mean, it affected them because they couldn't move into the facility, the plan that they had was struck down, but they weren't singled out. The ordinance applies to the entire parish. So on their equal protection claim, Judge Hike found they have not put themselves as members of a protected class entitled to assert an equal protection claim. They make much time and again in their papers about waste management had a waste transfer facility on the west side of Lafayette. They say, well, they have one. Why can't we have one? Well, that facility is 50 years old. Lafayette's changed since then. And just because there's one there does not mean the city is obligated to allow another waste transfer station and then another and then another. Let's say there's a nuclear power plant, and the next utility comes in and says, we want to put one up. Well, no, the fact that one is there does not mean you have a right to do the same thing. But that's their argument. I need to spend a couple of minutes on our appeal, which relates exclusively to a contractual indemnity claim involving their sub that runs in favor of the city. Judge Hike, that claim was filed by us when we, through discovery, found out that in addition to household and commercial garbage, Progressive intended to bring its recycled trash to that facility and then transfer it into these big trucks and then go down the road. And doesn't that indemnity just go to just cover negligence? I mean, how can this in any way be negligence, the decision to pass this moratorium and revoke the permit? How do you get around the negligence? First of all, a question of intent. We contend procedurally was improperly decided on a 12B motion early on in the case before there was any evidence adduced. By the time the judge ruled. You think it was a negligent act to pass the moratorium? Absolutely not. The council members voted, and that is a specific act. But they knew that action would impact the billing permit, which had just been issued. They're not all seeing and all knowing to know who else was out there with unrecorded contracts. And you can have an intentional act, but it can have negligence consequences on others. It can have unforeseen consequences, but what authority says that that's the type of situation covered by an indemnity agreement covering negligence? How does it go? Any type of legislative decision fits within a negligence indemnity provision. Judge, I've probably not seen as many indemnity agreements as members of the panel, but I've tried my share of them over the years. This is a very broad indemnity agreement. The trial court on a 12B motion within two months after our third-party claim was filed decided that the action was intentional in passing the ordinance, and therefore that makes everything else intentional conduct. We've cited cases that said the line between negligence and intentional conduct is often a murky one. Courts have gone in this direction. Courts have gone in that direction. We've cited cases that show that. And listen, if you remand on that issue, we may lose it. We may lose it. Once the evidence is adduced before the trial judge, he may find, yes, this is intentional conduct, and everything that flowed from it is a result of an intentional act, so it's intentional conduct as well. But he didn't have the evidence. He went on the pleadings in making that determination. And the cases are plain that that was improper. I mean, the cases are plain. He couldn't go outside the record a year and a half ago on that 12B motion. But that's what happened. This action is legislative action by a city council. They presented in the papers a claim for procedural due process. But that's not in their pleadings, and it only appeared here in the Fifth Circuit for the first time. Well, we cited cases to this court that make perfectly clear that as long as it's legislative action, which this undoubtedly was, the procedural due process has been satisfied, and there's no procedural due process. So that leaves us with substantive due process, and the substrata there is arbitrary and capricious, and then equal protection, which is my clients being singled out unfairly when, in fact, what we have is a blanket moratorium eliminating any new waste transfer facilities in the parish of Lafayette. And that's well within the legislative power of the council to do. That's not arbitrary. We could bring the citizens and see if they think shutting down that garbage dump next to their homes was an arbitrary decision. I mean, I can assure you the kids in getting on the school buses next to this Sunbeam Lane where they were planning to go don't feel it was an arbitrary decision to eliminate that permit. Oh, and in addition, on the negligence issue, Judge Costa, they also asserted a claim against the city under Article 2315 of the Louisiana Civil Code. And that's our negligence Bible. Every act, whatever, of man that causes damage to another obliges him by whose fault it happened to repair it. It's a negligence article, 2315 of the Civil Code. So they have actually pled negligence. And so on 12B, for the judge to say this indemnity is not valid because the passage of the act was an intentional act, well, they've got negligence claims. They've got a detrimental reliance. It has to arise out of the transaction with the recycling group, right? Pardon me? I don't have the exact language, but doesn't the indemnity provision say the incidents have to arise out of the arrangement with the recycling company? Yes. And Judge Hite, God love him, found on that 12B that because they were an exclusive provider of recycling services for the city of Lafayette, that somehow that meant the indemnity didn't apply to the work that was proposed at that facility. I don't see how he got there. I don't know if you bring in—you have that exclusive contract to get all the recycled garbage in Lafayette in the big brown bins, and you bring it into this place, and it's going to get processed there. How in the world does that not invoke the contractual indemnity in the recycling contract that runs in favor of the city? I don't understand how he made that leap, but I think the answer is, with all due respect, and I have great respect for Judge Hite, it was early in the game. It was early in the game. Wasn't one way to look at it that this whole dispute over this waste facility with Progressive could have happened even if that recycling agreement were never on the books? These people wouldn't have wanted this waste facility in their backyard for all the reasons you just explained. I think there's a very weak connection. I'm not seeing why you think the district court was so out of bounds on that. Well, I mean, if the work that they're doing under the recycling contract with the city of Lafayette involves going to that facility and processing all of that recycled garbage, I mean, how is that not invoking that contract? I mean, and then if that contract has an indemnity provision, as it does, a very broad one, I might add, then the indemnity ought to apply. It may take some determination. I'll acknowledge this. If you've got household and commercial garbage, you know, that they pick up with the big trucks all over the town, and then the recycled garbage, it may take an evidentiary hearing to say, how much was this, how much was that, get the evidence or the volumes, and that could impact the indemnity. I'm not saying that, but my point is for us to have been dismissed on the pleadings, which I think looking at it the other way, it's supposed to take our pleadings as true on a 12B, and if we alleged a contract in place, and the work was going to be done there, and there's indemnity, then our position is we should have been given another, a more open look by the district court on that issue. Okay. And I see my light's on. Thank you, Mr. Lord. Thank you, Judge. Okay. Submitted, we will. Pardon? Oh, I'm sorry. I'm sorry. I forgot about you. You have some time on rebuttal. I'm sorry. Thank you very much. Let me just briefly address the Recycling Foundation cross-appeal argument. And, Your Honor, it was not raised in our initial argument phase because they hadn't requested oral argument on that issue. But let me go ahead and address it anyway. The Recycling Foundation contract with the City of Lafayette and the identification language that is referenced therein relates to the recycling operations, the collection and disposal of recyclables, and defense and identification for any negligence that occurred as a result of those activities. So not only do we have an intentional act, which would not trigger the defense and identification clause, we have completely separate factual issues. This is not even the building of the transfer station has nothing to do with the 20-plus year contract between the city and the Recycling Foundation for the collection and disposal of recyclables. So on many different grounds, as Judge Costa has noted in his questioning, on a variety of different grounds, that issue was properly dismissed by the court. Let me go back and address the main issues that we're here to talk about today and specifically point out a couple of fallacies in the argument made by LCG. Number one, Mr. LaBoer mentioned and he brought out, you know, these poor school kids hopping on the bus having to drive by a waste transfer station. Didn't mention they have to hop on the bus and there's a prison right next door or an energy facility. This is not a residential area. The prison's right behind where we're proposing to build this thing. There's a Lafayette Energy LUS facility right next door. This is not a residential area. We were trying to shoehorn in a waste transfer station facility. It was an undeveloped, unzoned piece of property in a primarily industrial area. So that argument really should fall and has fallen on deaf ears. He says that progressive waste was not singled out, that this was a moratorium that affected all companies parish-wide. The ordinance was specifically drafted and redrafted at the request of Councilman Shelvin to shut down this project. So as a matter of fact, Councilman Shelvin stated on the record, I want to stop this project. Yes, it was specifically and intentionally singled out and that is the purpose, was the stated purpose behind the ordinance. That gets arbitrary and capricious right there because there were no valid grounds behind it. He clearly stated many times in his deposition, I didn't need a reason. I didn't have a reason. No, I never read those studies. No, I don't know what a waste transfer station is. This isn't a dump. It's not a landfill. It's completely different. They don't know that. They've never known that. They've never taken the time to go research and determine it. Their expert did, and their expert said, yeah, you know what? I put these in all the plans that I do for municipalities because it's a good idea to have them. That's the arbitrary and capricious argument. I'm going to back up a little bit more, and we're going to talk about the lease. And Council mentioned these suspensive conditions. The lease itself under paragraph 46 lists only two contingencies. One, contingent upon the landlord acquiring the land on or before August 5th of 2011, which waste facilities did. Two, the tenant performing a phase one environmental study satisfactory to the tenant. We did. Those are the only two contingencies to the lease. Obtaining an occupational license or an occupational permit starts the term of the lease. It's not a condition to the lease. That argument is inaccurate. I believe Judge Hike improperly took that into consideration, and I believe that is reversible error. There's only two contingencies in this lease, and they were both met. What about the – because I think I may have misunderstood you when I characterized it in questioning. What was your point about the judgment not being collectible in state court? Absolutely. You can get a judgment in state court. But you can't enforce it. You can't enforce it, and you can't get paid unless the municipality appropriates the funds. Federal court judgments are enforceable. They have to be paid. And a prime example is looking at the city of New Orleans. There's millions and millions and tens of millions of dollars in judgments against the city of New Orleans in state courts that don't get paid. And they're not enforceable because the city hasn't appropriated those funds. Federal court judgments, those get paid. And that's why we're here. They have to get paid. State courts, it's the appropriations clause. And if the city doesn't want to appropriate the money, it doesn't have to. And that's how judgments go unpaid. Again, that's one of the basis for why we were here. But the primary basis being we have federal law complaints, substantive due process takings that are properly before the federal court. Thank you very much, Your Honors. I appreciate your time this afternoon. Thank you, Mr. Cipollone. I believe now I can say that this panel will adjourn until tomorrow morning.